[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
An action for termination of parental rights was filed by the Department of Children and Families on December 3, 1993. A review of the juvenile court file indicates that this case was commenced on September 18, 1991 when a Neglect and Uncared For petition was filed with the juvenile court on behalf of three children Oliver B., born March 3, 1991 who at the time of the initial petition was five and a half months of age, Torey K. (also known as Toranado K.) and Corey K. (also known as Cory K.) who are twins born on October 13, 1989 and who at the time of the petition were 22 months of age. The petition further alleges that the biological parents are Elizabeth D. B., who at the time of the petition was an inmate at the Niantic Correctional Center and Toranado K., Sr. who at the time of the petition was likely incarcerated in New Orleans, Louisiana. The affidavits attached to the petition indicated that the Department of Children and Youth Services (DCYS) social worker had made a home visit on April 10, 1991. The apartment was known to be the scene of drug activity. There was drug paraphernalia strewn about the apartment. The social worker learned from the sister of Elizabeth D. B. that Elizabeth was a drug addict, that her children had been exposed to dangerous individuals and dangerous circumstances, that mother had been evicted from the premises and that she had a long criminal history. The social worker further learned from the hospital authorities that the children had been consistently medically neglected, that the youngest child's recent history included the fact that the child had been exposed CT Page 6862-A to cocaine, heroin and methadone prenatally, and that the female biological parent was not bringing the children for medical visits.
On June 26, 1991, the female biological parent Elizabeth B. D. was convicted of forgery, second degree larceny, parole violation and failure to appear and sentenced to three years at the Niantic Correctional Center. It was also learned that upon her discharge she was expected to be extradited to the State of Louisiana to complete a sentence imposed in that state.
The history of convictions and incarceration for Elizabeth B. D. is extraordinary, and includes numerous federal violations and federal incarceration beginning on July 9, 1973 when she was sentenced to 18 months in prison for possession of stolen mail. Thereafter she was convicted again of possession of stolen mail and ordered to serve three years. She served time in the federal prison in West Virginia for violation of probation having been sentenced to four years and six months. She was convicted in August of 1978 for forgery and uttering and sentenced to six years, had several convictions for possession of stolen mail violation of probation, violation of mandatory release, violation and unauthorized use of credit cards in St. Gabriel, Louisiana. In Connecticut she had charges of burglary, obtaining money under false pretenses, forgery, illegal use of credit cards, larceny and related offenses through her most recent conviction in April of 1991.
Elizabeth B. D. gave birth to her first child on September 1, 1973. At that time she was incarcerated at Niantic Correctional Facility. On March 26, 1986, Elizabeth B. D. gave birth to a son. At the time of the birth of that child she was incarcerated at the Niantic Correctional Facility. A third child was born to Elizabeth on October 14, 1988 and at that time she was incarcerated in New Orleans, Louisiana. Elizabeth has not raised any of those three children.
The children that are subject to this petition notably Corey and Torey spent time with various caretakers during their infancy. Prior to Oliver B.'s birth on March 3, 1991 Toranado K., these childrens' male biological parent, was extradited to the State of Louisiana and was CT Page 6862-B incarcerated there. It is believed that he has never seen the youngest child Oliver nor did he return to Connecticut until the month before the trial.
Elizabeth B. D. resided in Connecticut with her sister, who is also a substance abuser, from the time that Toranado K. was extradited until her subsequent arrest and incarceration on April 18, 1991.
With respect to the male biological parent, Toranado K., he was born in New Orleans, Louisiana on December 3, 1966. He was the third of four sons. Two of his three brothers have been shot to death in Louisiana. He has never been married and never been in the military service. The Department of Children and Family Social Worker was unable to obtain the arrest record for the male biological parent. The only contact the social worker had with Toranado K. was in a telephone conversation on December 22, 1992.
The telephone conversation with Toranado K. was initiated by the DCF social worker who had called Louisiana when she found out that Toranado had been released from prison. She called on several occasions and left several messages. When she did reach him she indicated to him that he should (1) establish contact with his children and (2) contact an attorney or seek legal aid since the Department was considering termination of parental rights. The social worker testified that she had never heard from him again although she had left the address and phone number of her agency. The social worker reported that on one occasion a birthday card was sent by Toronado directly to the foster home of the children so that it was clear that the male biological parent knew where his children were located.
The children had more contact with their female biological parent. The social worker took the children to Niantic to visit their female biological parent monthly the whole time that she was most recently incarcerated. The social worker indicated that the interactions between the minor child Oliver and Elizabeth were frightening. The child would cling to the social worker rather than the Elizabeth B.D. Elizabeth was a total stranger to this child.
The social worker indicated that Niantic Correctional CT Page 6862-C Institution has a wonderful play area for children which the children enjoyed during their visits. At times Elizabeth B. D. would try to engage the children, but the children had little or no interest in her. Of all three children, Corey did express some interest in Elizabeth D.B. The social worker did report, however, that Corey and Torey interacted with the foster mother as if she were their natural mother. None of the children related to Elizabeth D.B. as a psychological parent. At best the children may have understood that she was their biological parent. The minor child, Oliver has been in foster care so long that, as far as he is concerned, the foster mother is his mother.
Neither parent appeared for trial but both parents were competently and capably represented by counsel. Both biological parents contest the termination of parental rights action through their respective counsel. It was clear from the evidence adduced at the time of trial that both Elizabeth and Toranado had actual notice that the termination of parental rights action was pending, that both biological parents were in Hartford or in the Hartford area at the time of trial and neither parent made any effort to attend the trial.
Nonetheless, each of the parents through counsel have made argument in opposition to the termination of parental rights. Counsel for the female biological parent and the male biological parent were unable to point to even one affirmative act regularly and consistently done which would manifest a reasonable degree of interest and concern by the biological parents towards these children. Instead both parents attempt to fault the Department of Children and Families for some presently perceived failure on the part of the agency.
The female biological parent says in essence that the Department of Children and Families has failed to give her an opportunity to succeed as a parent. The record in this regard is clear that Elizabeth B. D. has had nearly a quarter of a century history of criminal conduct and substance abuse. In her argument the female biological parent accepts no personal responsibility for her criminal conduct which in part resulted in her incarceration and in her failure as a parent. She does not seem to recognize that continued abuse of drugs and her criminal conduct CT Page 6862-D constituted an abdication of her parental responsibilities. Her position is, in substance, that she should be privileged to have the joy of visiting with her children at the suffrage of DCF, but she has no corresponding parental responsibility or obligation.
In the testimony of the social worker regarding why the Department decided to recommend termination of parental rights the social worker listed the following reasons: (a) the mother's incarceration at the time of the petition and the length of her anticipated sentence, (b) the children's condition at the time they entered DCF care, (c) the future incarceration which was expected in Louisiana, (d) the 22 year history of drug abuse, incarceration and criminal conduct and (e) the failure of Elizabeth to cooperate regarding expectations. For example, she refused to sign a release regarding her involvement with Narcotics Anonymous and counseling. Since it would be important for the Department of Children and Families to obtain information indicating that the female biological parent had participated in Narcotics Anonymous meetings and had attended individual counseling as each of these things would tend to suggest that she recognizes a problem and is attempting to resolve those problems, her failure to sign a release suggests that she does not recognize her problem and is unprepared to deal with it.
It further indicates in the social study that waiting another year and a half for Elizabeth to obtain her release from jail, secure and maintain, adequate housing and conduct herself free of substance abuse, given her history of substance abuse and chronic incarcerations together with her inconsistency as a caretaker for her six children suggested that it was inadvisable to wait any longer.
This conclusion is entirely consistent with the psychological evaluation done by Dr. Robert D. Meier (State's Exhibit B) wherein he concludes as follows:
 "Based only on the clear special needs of the children and the length of time they have been in placement, it is strongly recommended that permanency be pursued as soon as possible. All three children are in need of stability, consistency, and a caring environment in order to maximize their adjustment and deal with their CT Page 6862-E special needs."
The court in this matter concludes based upon clear and convincing evidence that the statutory ground for abandonment of the children exists with respect to the male biological figure Toranado K., Sr. in that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the three children. Counsel for the male biological parent argues that the Department of Children and Families mislead him in a phone call wherein the social worker suggested that he relocate to Connecticut to establish and maintain contact with the children. A suggestion by the DCF worker is not an obligation or an order. The Department of Children and Families social worker also suggested that he get a lawyer which he failed to pursue and that he maintain contact with his children which he failed to do. He did not visit his children at all. He has never even met one of his children, Oliver. He has failed to demonstrate that degree of personal concern, interest and responsibility which is expected of any person with an interest, let alone a parent.
The petitioner further alleges that the parents of the children have failed to rehabilitate themselves. On November 26, 1991 the court records reflect that the male biological parent was at that time incarcerated and he was believed to be incarcerated until May of 1992. Counsel for the male biological parent indicated that he had no objection to a commitment and thereafter the court entered adjudication of uncared for based upon the children being homeless. As of the date of trial in this matter, neither parent had come forward to indicate that they were in a position to take the children home or to provide a home for the children. Both of the parents were believed to be out of incarceration at the date of trial. Our courts have indicated that personal rehabilitation of the parent means the restoration of the parent to his or her former constructive useful role. In RE: Migdalia M., 6 Conn. App. 194,203 (1986). The evidence produced at trial clearly and convincingly established that the respondents have failed to rehabilitate themselves in the sense that at the time of filing of the petition to terminate in December of 1993, neither parent was then able to resume the responsibilities of parenting. In RE Michael M., 29 Conn. App. 112,126-127 (1992). CT Page 6862-F
The court concludes that since neither parent was able to present a realistic plan for the care of these children and since the age and needs of these children are such that they should no longer be required to be in temporary foster care and since Dr. Meier the psychologist who evaluated these children has indicated that permanency planning is essential, the court finds the parents have failed to rehabilitate themselves as contemplated by Section 17a-112
(b)(2).
With respect to the petition by the Department and Children and Families alleging that there is no ongoing parent-child relationship within the contemplation of Section 17a-112(b) of the General Statutes, the court finds that this allegation has been proven. It is clear from the evidence presented at the time of the trial that Torey K., Sr. has not seen the children in nearly three years. He has had one telephone call to the foster home of the two older children in the past three years. That does not constitute a relationship. There is nothing in the record to indicate that any of the three children would even recognize Toranado K. if they saw him.
With respect to the female biological parent, the issues are of more concern. Elizabeth D. B. has seen the children by virtue of the children being brought to the Niantic Correctional Center. In addition, she has called the children at the foster home and spoken to the children from time to time on a fairly regular basis. These calls have not been always in the children's best interest. The foster mother described the telephone call from Elizabeth wherein she promised to take the kids to "Chucky Cheese and MacDonalds". This was during a period of her incarceration when she could not possibly take them. The children had no concept of future, the foster mother indicated that the children became very upset and frustrated because they believed they were going immediately.
The social worker indicated that during the once a month visits to Niantic, Torey had no interest whatsoever in the female biological parent but rather preferred to play with the toys provided. The twin, Corey was anxious for affection and would "cling to anyone including strangers". The youngest child, Oliver was positively CT Page 6862-G frightened by the experience of visitation at Niantic. The court concludes that the relationship, as limited as it was that exists between Elizabeth and these children is not that of a parent-child relationship. In RE Jessica M.,217 Conn. 459 (1991).
The court concludes that grounds exist for the termination of parental rights and that these grounds have existed for more than one year.
Accordingly, the court is required to make determinations pursuant to Section 17a-112(b).
Paragraph 1. Regarding the nature and timeliness of services offered by the Department and Children and Families, the court finds that the Department has made family preservation services available to the family and the Klingberg Family Center. These services were offered prior to Elizabeth B. D.'s incarceration in 1991. Visitation was arranged, coordinated and conducted by DCF.
Paragraph 2. Regarding the Department of Children and Families' efforts for reunification pursuant to the Federal Child Welfare Act of 1980 the court finds that the Department made reasonable efforts given the situation and circumstances to reunite the family. The Department made arrangements for monthly visitation at the Correctional Center in Niantic from mother and also arranged for telephone calls to be made to the foster parent's home.
Paragraph 3. Regarding the court's orders and fulfillment of the obligations and expectations set up by the court, the court finds that the Department with the approval of the court set reasonable and realistic expectations at the time of the adjudication of uncared for. As far as is possible to tell there has been no compliance or participation on the part of the father and minimal compliance on the part of the mother in so far as she did not attend the counseling that was required nor would she sign releases in order to allow the Department of Children and Families to monitor her compliance. Similarly neither parent was able to obtain or provide adequate housing or a plan for the care for these children.
Paragraph 4. The psychological evaluation which is CT Page 6862-H put into evidence and the reports from the DCF social worker and the foster parents indicate that these children have strong emotional ties in their respective foster families that the foster mothers are sisters and accordingly make the children available to each other so that the children know that they are siblings even though they are living in two separate foster homes. The children all consider their foster parents to be their psychological parents. The children have little or no positive emotional ties to the biological parents.
Paragraph 5. Regarding the age of the children, the twins are four and a half years of age. Oliver is three years of age. The psychologist has indicated that these children require stability of placement and continuity of care at this time.
Paragraph 6. Regarding the parents' efforts to conform their conduct to the best interest of the children the court concludes that even though the parents have been incarcerated for a substantial portion of the time that the children have been in placement neither parent has demonstrated that degree of interest and involvement with these children that would warrant further delay of permanent planning. Giving them additional time would not likely bring their performance as parents within acceptable standards sufficient to make it in the best interest of the children to be reunited with them.
Paragraph 7. Regarding acts preventing a meaningful relationship with the child or any person, foster parent, agency making or doing unreasonable acts or creating economic hardships the court finds that the Department did virtually all of the initiating of any contact. It was the social worker who made numerous calls to Louisiana to contact the father. It was the Department of Children and Families who arranged the monthly visitation at Niantic. No unreasonable conduct is noted. The mere fact that the Department of Children and Families social worker urged the father to move back to this area to establish contact with his children is not considered to be a bar to contact. It was a suggestion that the father pl place himself in reasonable geographic proximity to the children so that he could maintain a relationship with them. The principal obstacle to parenting for both of these parents is their own personal criminal conduct and behavior which has CT Page 6862-I resulted in their respective incarceration.
Based upon the foregoing findings the court concludes that it is in the best interest of these three children to terminate the parental rights of Elizabeth B. D. and Toranado K., Sr. It is accordingly ordered that their parental rights are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within ninety days. A motion to review plan for terminated child shall be filed in accordance with federal law.
VI. APPEAL
The parents have twenty days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel is willing to continue representation, this court will appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book § 4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of forty days as permitted by law. Practice Book § 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the court clerk of the balance of the forty days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v.California, 372 U.S. 353 (1963); Fredericks v. Reincke.152 Conn. 501 (1964).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori
appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is CT Page 6862-J entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Foley, J.